# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

JOSHUA HAUSFELD,

     Plaintiff,

     v.

LOVE FUNDING CORPORATION,

     Defendant.

Civil Action No. TDC-14-0142

## MEMORANDUM OPINION

Plaintiff Joshua Hausfeld worked as a loan originator for Defendant Love Funding Corporation ("LFC") for several years before LFC terminated his employment in May 2013. This action arises from LFC's failure to pay commissions to Hausfeld for loans that originated before his termination. Hausfeld asserts claims for a violation of the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. §§ 3-101 *et seq.* (West 2015), and breach of contract, and he seeks a declaratory judgment that he is entitled to commissions for the work performed prior to his termination. Presently pending are LFC's Motion for Summary Judgment and Hausfeld's Cross-Motion for Partial Summary Judgment. The Motions are fully briefed and ripe for disposition. No hearing is necessary to resolve the issues. *See* Local Rule 105.6 (D. Md. 2014). For the reasons set forth below, LFC's Motion for Summary Judgment is DENIED. Hausfeld's Cross-Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I.     Hausfeld's Employment in Maryland

LFC is a Virginia mortgage banking company that offers Federal Housing Administration ("FHA") insured loans for multifamily housing, affordable housing, healthcare facilities, and hospitals.  It is headquartered in Washington, D.C. and does not maintain offices in Maryland. Hausfeld, a Maryland resident, joined LFC as an underwriter in March 2006, then was promoted to the position of Vice President–Loan Originator in April 2010, reporting directly to Mark Dellonte, the President and Chief Executive Officer ("CEO") of LFC.  In January 2013, Hausfeld was promoted to Senior Director of Originations.  Hausfeld was an at-will employee.

Originators serve as the "face" to LFC clients.  *See* Pl.'s Mem. Opp. Summ. J. ("Pl.'s Opp."), Ex. 3, at 9, ECF No. 32-5.  Among their responsibilities is to "identif[y] lending opportunities" and "to generate business for the company." *Id.* at 9–10.  Although Hausfeld was based out of LFC's office in Washington, D.C., his duties required him to travel to various states across the country.  Hausfeld often worked from his home in Maryland.  Using a mobile device provided by LFC, he regularly initiated communications with borrowers and potential borrowers from his home office, from which he had access to the company server.  Dellonte and Jonathan Camps, Senior Vice President of LFC, were aware of and did not object to Hausfeld working from home.

Dellonte and Camps instructed Hausfeld that being a successful originator required him to go outside the office to generate clients.  They encouraged Hausfeld to spend minimal time in the office and most of his time at marketing functions, potential client meetings, and site visits. For almost all of the loans he originated, Hausfeld attended meetings at the borrower's premises

and conducted site visits to assess the potential real estate collateral for proposed loan transactions.  Many of the potential borrowers included residents and businesses in Maryland.

Hausfeld's Employment Agreement provided that LFC "normally schedules originators for one or two conferences or conventions each year for business development and education purposes."  Pl.'s Opp. Ex. 5, at 2, ECF No. 32-7.  In 2010, Camps approved Hausfeld's request to attend the Health Facilities Association annual meeting in Ocean City, Maryland to generate future business and maintain a presence in Maryland.  LFC paid Hausfeld's expenses.  In 2011 and 2012, Camps approved Hausfeld's proposal to sponsor an exhibit booth at the annual meeting and advertised Hausfeld's attendance on the LFC website.  Hausfeld also attended annual meetings in Baltimore, Maryland for the Eastern Lenders Association in order to maintain a presence within the FHA lending community.  LFC sponsored the Baltimore annual meetings and paid all of Hausfeld's expenses of attending.

Because LFC offers FHA loans, Hausfeld also attended networking events at the Baltimore office of the United States Department of Housing and Urban Development ("HUD") geared toward encouraging greater interaction between LFC and the HUD office.  In 2012, he also attended, on behalf of LFC, the Bisnow Multifamily Conference in Bethesda, Maryland, where he expected to meet with potential borrowers, and meetings in Rockville, Maryland of the Society of Physician Entrepreneurs and the Johns Hopkins Alumni Real Estate Forum.

In 2011, Hausfeld and a fellow loan originator, Artin Anvar, proposed a marketing campaign to Dellonte and Camps, known as the A7 Marketing Campaign, which targeted Maryland and other states.  Dellonte and Camps approved the campaign, which Hausfeld and Anvar carried out until Hausfeld's termination.  The campaign generated loans relating to Airpark Apartments in Gaithersburg, Maryland and Woodington Gardens in Baltimore.  For the

Woodington Gardens loan, Hausfeld made three site visits to the property in Baltimore and attended a meeting at the Baltimore HUD office with a representative from Woodington Gardens and an LFC underwriter.

Hausfeld's networking and marketing activities resulted in many loan prospects in Maryland, such as the Paradise Assisted Living Facility in Catonsville, Maryland (2011), the Randolph Hills Nursing Center in Wheaton, Maryland (2012), and the Forest Glen Nursing Home in Silver Spring, Maryland (2012). Although none of those prospects resulted in loan closings, Hausfeld made multiple visits to Maryland locations to examine the premises and meet with the potential borrowers.

## II.    Hausfeld's Terms of Employment

Hausfeld's Employment Agreement provided that his duties were to "[o]riginate loans through direct borrower contact, coordinate the preparation and submission of potential loans to funding sources, facilitate the process from application to commitment, and assist in closing loans." Pl.'s Opp. Ex. 5, at 1. Under the Agreement, Hausfeld was paid a $100,000 annual salary plus production commissions, as calculated under LFC's Compensation Policy and paid quarterly "after the fees are earned and received by the Company." *Id.* at 2. Production commissions were calculated based on a schedule of percentages of an originator's "Annual Production," which generally consisted of the profits, fees, and certain revenue associated with originated loans. *Id.* In February 2013, LFC updated its compensation policy to include a new Originator Compensation Plan ("Compensation Plan"). Because Hausfeld was an originator, the terms of the Compensation Plan applied to him. The Compensation Plan provided that, in addition to base salary, originators are entitled to receive production commissions based on Annual Production "paid quarterly in arrears after the fees are earned and received by the

Company." *See* Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") Ex. 6, at 4, ECF No. 31-8. To earn the production commissions, an originator's Annual Production must total more than twice his or her base salary.

Neither the Employment Agreement nor the Compensation Plan specifically identifies the specific actions an originator must take to earn a production commission on a loan. A Quality Control Plan developed by LFC provides that although originators are expected to maintain the client relationship throughout the entire process, loan closing coordinators "are responsible for coordinating the closing of loan commitments." Pl.'s Opp. Ex. 3, at 10, 15. Loan closing coordinators are responsible for ensuring that all HUD requirements are met, "that draft closing documents are in the correct form and reflect the approved mortgage budget, establish special accounts, ensure that all legal documents and mortgage instruments are properly executed and that all required closing document are assembled, recorded, and filed." *Id.*

The Compensation Plan also includes a deferred compensation clause designed, in part, to incentivize high earning originators to remain with the company. Dellonte, who instituted deferred commissions, described it as "a golden handcuff if you will." Pl.'s Opp. Ex. 4, Dellonte Dep. 42:10–13, ECF No. 32-6. Under the deferred compensation clause, if an originator's Annual Production totals more than $1,000,000, the originator is then entitled to a production commission equal to 55 percent of the originator's Annual Production. The originator, however, is paid only 50 percent of the Annual Production at the next quarterly commission pay period. The remaining five percent is deferred for three years. After that three-year period, if the originator remains employed by LFC, the last five percent is paid out at the next quarterly commission pay period.

Under this system, the deferred commission was earned by the originator for work already performed. The only requirement to receive the deferred commission is to remain an LFC employee for three years after the commission was earned.  The Compensation Plan, however, provides that, "Upon termination of employment, no production commissions will be paid to the former originator other than at the discretion of the Executive Management Committee."[1]  Def.'s Mem. Ex. 6, at 6.

### III.    Hausfeld's Termination

As part of its business, LFC trades Government National Mortgage Association mortgage-backed securities ("Ginnie Maes").   LFC sells the Ginnie Maes to fund the loans it makes to borrowers.   According to LFC, its Ginnie Mae business is built on the strong relationships and reputation it has fostered with investors over the years.  Because having a good relationship with investors helps LFC get the best interest rates available on the market, a tarnished reputation would affect its ability to get competitive interest rates.

On May 3, 2013, LFC terminated Hausfeld after he had asked Kimberly Estep of Branig Capital Markets to seek bids for three of LFC's Ginnie Maes relating to the Ponce Plaza Nursing & Rehab ("Ponce Plaza"), Arch Plaza Nursing & Rehab ("Arch Plaza"), and Villa Ocotillo

---

[1]    The Employment Agreement contains the same language, but further provides that "Such production commissions shall be ratable to the extent that the former originator contributed to the overall necessary and normal requirements by originators to close the loan, the amount of staff effort required to close the [loan], the originator's absence, and the circumstances surrounding the termination of the originator."  Def.'s Mem. Ex. 4, at 4, ECF No. 31-6.  It is not entirely clear whether the terms of the Compensation Plan, which are not signed by the parties and contains the statement that it "is not intended to be a contractual commitment," Def.'s Mem. Ex. 6 at 2, constitutes an amendment to the Employment Agreement by virtue of the language in the Agreement that "LFC reserves the right to modify its compensation policy as deemed necessary and prudent by the Executive Management Committee."  Def.'s Mem. Ex. 4, at 4.  Because the parties appear to accept the Compensation Plan as part of the Employment Agreement, and because the outcome of these Motions does not depend on whether the Plan is part of the Agreement, the Court does not decide this issue.

properties.  At the time, LFC employed William "Bill" Jones as an in-house Ginnie Mae trader.
Estep was not an authorized Ginnie Mae trader for LFC.  On May 2, 2013, when Hausfeld could
not make contact with Jones, he consulted with Estep about what prices could be obtained, then
spoke to Dellonte and Jones.  Although Hausfeld states that he believed Jones gave him
permission to have Estep seek bids for the loans, Dellonte asserts that he forbade Hausfeld from
moving forward with Estep.  Hausfeld then asked Estep to seek bids, which caused confusion
among LFC's investors, at least one of whom, Deustche Bank, thought it had purchased a Ginnie
Mae.  Estep knew that Jones was LFC's trader and that Jones needed to give permission before
Estep could take any action.  Based on her belief that Jones had authorized Hausfeld to have her
to seek bids, Estep solicited bids, but she did not sell any of the Ginnie Maes.  Dellonte stopped
Estep before any Ginnie Maes were sold.

While this activity was occurring, Jones received telephone calls from LFC investors
asking why someone other than Jones was seeking to trade LFC Ginnie Maes.  Deutsche Bank
called Jones under the belief that it had purchased the Ponce Plaza loan from Estep.  Credit
Suisse contacted Jones because it had placed bids on the Villa Ocotillo and Arch Plaza loans.  As
it turned out, Jones had separately obtained bids on the Villa Ocotillo loan and sold it to
Goldman Sachs, the highest bidder, the same day.  LFC had to tell the investors that it could not
honor any of the pending bids or transactions arising from Estep's activities.  Because of the
need to restore investors' confidence in LFC, Jones was unable to sell the Arch Plaza and Ponce
Plaza loans until May 8, 2013, at a price lower than the bids Estep had received.  LFC terminated
Hausfeld because of his role in this episode.

## IV.     Disputed Commissions

When Hausfeld was terminated, LFC decided not to pay him any further commissions, including his deferred commission on his Annual Production.  In 2012, Hausfeld generated an Annual Production of $5,043,397, resulting in over $2,500,000 in production commissions. After subtracting previously paid commissions, LFC calculated that it owed Hausfeld $202,160 in deferred commission.  LFC did not pay Hausfeld the deferred commission because he was terminated for cause.

LFC also did not pay Hausfeld production commissions, to which Hausfeld asserts that he is entitled, relating to 11 loans.  These loans, which had not yet, or had only recently, closed as of the date of Hausfeld's termination, were either originated by Hausfeld, or were originated under an agreement Hausfeld had with Anvar to split commissions on loans generated by either originator.

The specific loans for which Hausfeld seeks production commissions are:  (1) Forest Cove Apartments ("Forest Cove"); (2) Villa Ocotillo; (3) Sea Mar Community Health Center ("Sea Mar"); (4) Airpark Apartments; (5) Arch Plaza; (6) Ponce Plaza; (7) Staunton VA Assisted Living Facility ("Staunton VA"); (8) Orchard Park of Pearland; (9) Orchard Park of Murphy; (10) Orchard Park of Odessa; and (11) Adagio at Westshore Palms ("Adagio").

### A.     Loans Subject to the Commission-Split Agreement

Four of the 11 loans originated from the A7 Marketing Campaign with Anvar.  Hausfeld and Anvar agreed to split equally all commissions earned from loans generated by the A7 Marketing Campaign.  The Compensation Plan contemplates splitting commissions when two or more originators are involved in a loan, as recommended by the originators and approved by management.  The commission split applied no matter whether Hausfeld or Anvar was the lead

originator of the loan, and no matter the amount of work that either performed.  Hausfeld and Anvar memorialized the agreement in emails to LFC.  As particular loans came close to closing, Hausfeld and Anvar emailed LFC to indicate that they were splitting the commission.  LFC honored the commission-split agreements and did not ask about the division of labor in originating the loans.

### 1. Forest Cove

On the Forest Cove loan, Anvar was the lead originator.  The Forest Cove loan closed before Hausfeld was terminated but before commissions were paid.  Thus, there was no work required of Hausfeld to earn the commission that he failed to complete.  According to Dellonte, had Hausfeld not been terminated, he would have received his production commission for Forest Cove.

### 2. Villa Ocotillo, Sea Mar, and Airpark Apartments

Villa Ocotillo, Sea Mar, and Airpark Apartments are the other loans that resulted from the A7 Marketing Campaign with Anvar and were subject to the commission-split agreement between Hausfeld and Anvar.  Anvar was the lead originator on all three loans.  For the Villa Ocotillo loan, Anvar made the initial call to the borrower in late 2011 and set up site visits. Anvar initiated the loan process, signed and negotiated the engagement letter, walked the borrower through the transaction, and handled issues as they arose, such as assisting with repairing handrails on the premises to comply with HUD requirements.  Anvar worked with the borrower to get the rate lock authorization signed and assisted the borrower with the settlement statement.[2]  The deal, which closed on July 26, 2013, did not require an in-person closing.

---

[2]  The rate lock process is the process by which the originator works with the borrower to secure an interest rate for the loan.  After the borrower signs an engagement letter, submits a good faith deposit, and signs the rate lock authorization, LFC is able to lock in the interest rate for the loan.

The Sea Mar loan was initiated in November 2012 and closed on July 30, 2013.  After making the initial call to the borrower, Anvar negotiated and signed the engagement letter, assisted in obtaining the HUD certification, assisted in the rate lock process, and explained the closing process to the borrower.  The Sea Mar loan closed on time and without issues.  Anvar did not attend the closing.

The Airpark Apartments loan was initiated in March 2013 and closed on January 27, 2014.  As with the other loans, Anvar signed and negotiated the engagement letter, assisted in obtaining HUD certification, assisted with the rate lock authorization process, and explained the closing process.  Hausfeld attended only one meeting with Anvar at the premises of Airpark Apartments in Maryland.  The loan closed on time and without incident.  Anvar did not attend the closing.

**B.      Arch Plaza and Ponce Plaza**

The Arch Plaza and Ponce Plaza loans, which had the same borrower, closed on June 26, 2013.  After Hausfeld was terminated, no other loan originator was assigned to the loan, and no production commission was paid to any other loan originator.  Prior to closing, the borrower and its insurance agent requested to finance the insurance premiums as part of the mortgage payment.  Camps acknowledged that the loan closing coordinator for Arch Plaza and Ponce Plaza resolved the issue, but stated that he was available if needed, and that Hausfeld would have been expected to be available had he not been terminated.  Camps specifically assisted with an issue that arose the day before closing when the borrower wanted a higher payoff amount in order to release the full collateral used to secure the mortgage.  Camps had to explain that such a change was not permitted and had to convince the borrower to leave the full collateral in place.

### C.       Staunton VA

The Staunton VA loan closed on July 23, 2013.   During his deposition as the LFC corporate designee on November 20, 2014, Camps testified that no originator replaced Hausfeld on this loan.   He stated that "It was not allocated to me.   It was not allocated to another originator.   I suspected that Karen Ford stepped in on that, but I do not recall specifically."   *See* Pl.'s Opp. Ex. 8, Camps Dep. 174:18–21, ECF No. 32-10.   In his affidavit executed on February 17, 2015, however, Camps stated that for this loan, he took over responsibilities typically handled by the originator after Hausfeld's termination and specifically noted that he handled the rate-lock process shortly after Hausfeld's departure.

### D.       The Orchard Park Loans

Orchard Park of Pearland, Orchard Park of Murphy, and Orchard Park of Odessa (collectively, the "Orchard Park Loans") were construction loans.   Unlike other loans, construction loans have two closings:   an initial endorsement closing and a final endorsement closing.   After the initial endorsement closing, construction of the property commences, throughout which the loan is dispersed to the borrower over a series of payments called "draws." Def. Mem. Ex. 25, Camps Decl. ¶ 8, ECF No. 31-27.   The final endorsement closing occurs when construction concludes.   For the purposes of calculating production commissions for construction loans, originators are given credit toward their Annual Production based on the revenue received from the draws during construction.

The initial endorsement closings occurred on September 21, 2011 for Orchard Park of Murphy; on November 18, 2011 for Orchard Park of Odessa; and on March 13, 2013 for Orchard Park of Pearland.   The final endorsement closings occurred on December 16, 2013 for Orchard

Park of Murphy; on December 30, 2013 for Orchard Park of Odessa; and on October 21, 2014 for Orchard Park of Pearland.

Until his termination, Hausfeld was paid all commissions that became due as draws were made on all three loans.  No other loan originator was assigned to the loans or was paid the remaining production commissions for these loans. During the period between Hausfeld's termination and the final endorsement closings, Camps handled certain matters relating to the loans.  For example, all three loans received mortgage reductions, under which the loan amount is reduced when a HUD review shows that the construction costs are expected to be lower than originally anticipated.  Camps had several conversations with representatives of the borrowers to explain the mortgage reductions.   He also had to engage with the borrower on back-end extension fees incurred on the Murphy and Odessa loans.  On the Odessa loan only, Camps also had to assist in resolving a temporary withholding of the final draw due to a wage issue.

**E.      Adagio**

Adagio was also a construction loan.  The initial endorsement closing for Adagio did not occur until August 29, 2013.  Because no draws were made before Hausfeld's termination, he received no production commissions on the loan.   LFC Executive Vice President and Chief Operating Officer Karen Ford, who was the loan closing coordinator for Adagio, has stated that she performed some responsibilities typically handled by the originator on the loan.  During the initial endorsement closing, the value of the borrower's construction contract increased, causing it to have to fund the shortfall before the initial endorsement closing could occur.   During construction, the borrower could not afford to fund change orders to the contract.  Ford assisted in resolving these issues.

Camps, however, testified that Ford's role on the loan was as a closer and stated that "Karen, had Josh been there, still probably would have been the closer on the transaction." Pl.'s Opp. Ex. 8, Camps Dep. at 180:20-181:7. For his part, Camps stated that he assisted with this loan as a point of contact for the borrower and participated in several phone calls with the borrower, who was inexperienced with HUD loans, to provide reassurance. As of the filing of LFC's Motion for Summary Judgment, Adagio had not yet had a final endorsement closing.

## V.      Procedural History

On December 13, 2013, Hausfeld filed suit against LFC in the Circuit Court for Montgomery County, Maryland, asserting claims for a violation of the MWPCL (Count I), breach of contract (Count II), and a declaratory judgment (Count III). In its Answer, LFC asserted an affirmative defense of set-off and recoupment. On January 17, 2014, LFC removed the action to this Court. LFC has filed a Motion for Summary Judgment, arguing that it is entitled to judgment as a matter of law on all claims. Hausfeld has filed a Cross-Motion for Partial Summary Judgment seeking judgment as a matter of law in his favor on (1) the MWPCL claims relating to LFC's failure to pay his deferred commission and his Forest Cove production commission; and (2) LFC's set-off and recoupment affirmative defense.

## DISCUSSION

## I.      Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court must believe the evidence of the non-moving party, view the facts in the light most favorable to the nonmoving party, and

draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248) (internal quotation marks omitted). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

## II.      The MWPCL Claim

In Count I, Hausfeld claims that LFC has unlawfully failed to pay him wages that he rightfully earned, in violation of the MWPCL.  The MWPCL provides that employers must pay employees "all wages due for work that the employee performed before the termination of employment."  Md. Code Ann., Lab. & Empl. § 3-505(a).  Commissions are wages for the purposes of the MWPCL.  *See* § 3-501(c)(2)(ii).

LFC moves for summary judgment on Hausfeld's MWPCL claim on the following grounds:  (1) the MWPCL does not apply to this case because Hausfeld's employment relationship with LFC was centered in the District of Columbia, not Maryland; and (2) under the factual record in this case, Hausfeld did not fulfill his obligations to earn the commissions in

question, so there is no genuine issue of material fact on whether Hausfeld is owed the commissions.

Hausfeld cross-moves for partial summary judgment on his MWPCL claim relating to his deferred commission and Forest Grove production commission, arguing that the evidence is undisputed that he earned those commissions prior to his termination.

## A.    Applicability of the MWPCL

As an initial matter, LFC argues that the MWPCL is inapplicable to this case because District of Columbia law, not Maryland law, governs this dispute.  Specifically, LFC asserts that under the doctrine of *lex loci contractus*, District of Columbia law applies because LFC and Hausfeld's work were based in the District of Columbia, and the Employment Agreement between LFC and Hausfeld originated in the District of Columbia.  Hausfeld responds that Maryland courts have recognized MWPCL causes of action, even when the employment arrangement originates in another state, provided that the employee has engaged in some work in Maryland.  As discussed below, the Court finds that Maryland law and the MWPCL apply to this case because (1) LFC is an "employer" under the MWPCL, such that the MWPCL would be applicable to Hausfeld's employment; and (2) Maryland law applies because of Maryland's strong public policy, as expressed in the MWPCL, that employees must be paid all wages earned.

### 1.    LFC is a Maryland "Employer"

The MWPCL provides "a remedy to employees who are attempting to collect lost wages" from an employer.  *Cunningham v. Feinberg*, 107 A.2d 1194, 1203 (Md. 2015) (citations omitted).  The statute defines "employer" as "any person who employs an individual in the State."  Md. Code Ann., Lab. & Empl. § 3-501(b).  To "employ" under the MWPCL includes "allowing an individual to work" and "instructing an individual to be present at a work site."  §

3-101(c)(2).  The MWPCL thus applies to a company that either allows an employee to work in Maryland or instructs the employee to be present at a work site in Maryland.  *Himes Assocs., Ltd. v. Anderson*, 943 A.2d 30, 48 (Md. Ct. Spec. App. 2008).  The fact that an individual works for an out-of-state company, located in that state, under an employment contract governed by the laws of that state, does not preclude the applicability of the MWPCL.  *Cunningham*, 107 A.2d at 1198, 1210-11, 1218.

The threshold for establishing employment in Maryland under the MWPCL is relatively low.  The employee does not have to be regularly employed in Maryland.  *Himes*, 943 A.2d at 48–49.  In *Himes*, the Maryland Court of Special Appeals held that the MWPCL applied to the work of a project manager for a Virginia corporation, who worked out of the corporation's Fairfax, Virginia headquarters, because the employee served as a project manager for a Lockheed Martin construction project in Virginia that required him to attend meetings twice a month at Lockheed Martin's office in Baltimore, Maryland.  *Id.*  Here, Hausfeld worked in Maryland to an even greater extent than the employee in *Himes*.  To identify potential business and generate revenue for LFC, Hausfeld proposed and engaged in a marketing campaign that generated prospective Maryland borrowers whose premises Hausfeld visited, conducted various site visits to properties in Maryland that were the subject of loans, attended meetings at the HUD office in Baltimore, and attended various conferences and events in Maryland to generate business for LFC and maintain its presence in the Maryland lending community.  LFC encouraged Hausfeld to spend minimal time in his office in Washington, D.C. and instead to spend time "on the road" at marketing events, potential client meetings, and site visits.  Pl.'s Opp. Ex. 6, Hausfeld Decl. ¶ 5, ECF No. 32-8.  LFC supported Hausfeld's Maryland activities by approving his proposals, paying for his attendance at Maryland events, and advertising his

attendance at conferences.    Throughout that period, with the approval of his supervisors, Hausfeld worked frequently from his home in Maryland, aided in part by company-supplied mobile devices and remote network access.

LFC attempts to downplay Hausfeld's involvement in Maryland by noting that Hausfeld attended conferences and association meetings sporadically at his own discretion, that he was never required to work in Maryland, and that Hausfeld's work was not sufficiently Maryland-focused because LFC has clients nationwide and some of Hausfeld's Maryland contacts originated from national marketing campaigns with which Hausfeld had little involvement in planning.  LFC also notes that Hausfeld met infrequently with individual borrowers in Maryland, and that his efforts there did not lead to loan closings.

Under the statute, however, LFC is an "employer" if it "allows an individual to work" in Maryland.  *See* Md. Code Ann., Lab. & Empl. §§ 3-101(c)(2), 3-501(b).  There is no requirement that the company direct the employee to work in Maryland.  Moreover, there is no requirement that the work performed in Maryland be specifically targeted toward Maryland, or that the work prove successful or profitable for the employer.  All that is required is that the individual work to some extent in Maryland. The sum of Hausfeld's involvement across borrowers, events, and site visits is sufficient to meet the threshold of employment in Maryland, particularly when coupled with the work that Hausfeld did for the company from his home in Maryland.  *See Himes*, 943 A.2d at 48–49.  Thus, LFC is an "employer" under the MWPCL, such that the statute applies to Hausfeld's earnings.

### 2.   Choice of Law:  *Lex Loci Contractus*

LFC argues that even if the MWPCL is deemed to apply to Hausfeld's compensation from LFC, the MWPCL is nevertheless inapplicable because as a choice-of-law matter, District

of Columbia law governs this case. A federal court sitting in diversity applies the choice-of-law principles of the forum state, in this case, Maryland. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Zimmerman v. Novartis Pharm. Corp.*, 889 F. Supp. 2d 757, 761 (D. Md. 2012). Citing *Yeibyo v. E-Park of DC, Inc.,* No. DKC-200701919, 2008 WL 182502 (D. Md. Jan. 18, 2008), LFC argues that Hausfeld's MWPCL claim for unpaid wages is effectively a contract claim. *Yeibyo*, 2008 WL 182502, at *5 (holding that an MWPCL claim sounds in contract because "employment relationships are paradigmatically contractual in nature"). Maryland law generally applies the doctrine of *lex loci contractus*, which provides that a contract dispute is governed by the law of the jurisdiction in which the contract was made. *See Allstate Ins. Co. v. Hart,* 611 A.2d 100, 101 (Md. 1992). Because the Employment Agreement between LFC and Hausfeld was signed in the District of Columbia, LFC argues that District of Columbia law applies. *See Yeibyo*, 2008 WL 182502, at *5-*6 (dismissing Maryland wage law claims because the employment contract was executed in the District of Columbia and stated that it was governed by Massachusetts law).

The Maryland Court of Appeals, however, has recently addressed this very issue in *Cunningham v. Feinberg*, 107 A.2d 1194 (Md. 2015). In *Cunningham*, the court held that an attorney could bring a claim under the MWPCL for unpaid wages against a Virginia-based law firm at which he had worked, because although the employment contract had been entered into in Virginia, and he was required to spend the vast majority of his time at the office in Virginia, he handled Maryland cases and attended depositions, client meetings, and court proceedings in Maryland. *Id.* at 1198-99. In so holding, the court expressly rejected the conclusion in *Yeibyo* that *lex loci contractus* necessarily applies to an MWPCL action. *Id.* at 1203-04, 1210-11. ("[E]mployees working for employers located in Virginia are not limited to remedies available

under Virginia's wage payment laws, but may, in certain circumstances, be answerable to claims under the MWPCL in Maryland courts.").   Rather, the court found that because the employment contract at issue did not have a choice-of-law provision, and the case did not involve a "dispute over the validity and enforceability of the contract" or "a dispute over the construction or interpretation of one of the express terms or provisions of the contract," *lex loci contractus* did not apply.  *Id.* at 1205-06.

It is not certain how this rule applies to the facts before the Court.   Here, the Employment Agreement between LFC and Hausfeld does not have a choice-of-law provision, and there is no dispute regarding the validity of the contract.   LFC, in arguing that Hausfeld has not earned production commissions, seeks to interpret the term stating that one of an originator's duties is to "assist in closing loans," though as set forth below, the Court does not consider that term to define when an originator has earned a commission.   Hausfeld does, however, claim that one provision of the contract, the term that gives LFC discretion not to pay any commissions after termination, is unenforceable.   So it is likely that this case falls within the category of cases to which *lex loci contractus* would ordinarily apply.   But *Cunningham* relied significantly on *Himes*, in which the Maryland Court of Special Appeals held that the MWPCL applied to the work of a project manager for a Virginia corporation, even though that case involved a dispute about "contractually-provided severance pay."   *Cunningham*, 107 A.3d at 333 (discussing *Himes*); *Himes*, 943 A.2d at 35.   In *Himes*, there was a dispute over how much severance pay was owed to an employee, which required the court to interpret the contractual term "terminated . . . for reasons other than performance or cause."   *Himes*, 943 A.2d at 35, 38-39.   Because *Cunningham* referenced *Himes* favorably and did not identify that MWPCL case involving interpretation of a contract term as a case in which *lex loci contractus* should have been applied,

it is difficult to conclude with absolute certainty that *lex loci contractus* applies to the present case.

Nevertheless, even if the present case falls within the category of MWPCL cases involving one of the conditions identified in *Cunningham* which requires application of *lex loci contractus*, as it appears to do, this Court concludes that Maryland law would apply because of Maryland's strong public policy interest that earned wages must be paid.  *See Cunningham*, 943 A.2d at 1215.  In *Cunningham*, after concluding that *lex loci contractus* was inapplicable on the facts of that case, the Maryland Court of Appeals stated, albeit in *dicta*, that Maryland has a longstanding exception to applying *lex loci contractus* "when doing so would be contrary to a strong public policy of this State," and that the court "would be inclined not to foreclose" recovery "under the MWPCL in Maryland's courts for public policy reasons."  *Id*. at 1211 (internal quotation marks omitted).   The court went on to criticize cases in which federal courts have refused to find that the MWPCL reflected the strong public policy of Maryland, noting that such cases typically involved contracts with choice-of-law provisions, and  emphasized that many such cases predated a 2011 amendment to the MWPCL adding a provision explicitly stating that "[a]n agreement to work for less than the wage required under this subtitle is void," which applies to bonuses and commissions.  *Id.* at 1216; Md. Code Ann., Lab. & Empl. §§ 3-502(f), 3-501(c).  The court recounted the legislative history of the amendment, which indicated that the amendment was intended "to clarify for the courts that the MWPCL is important public policy." *Cunningham*, 107 A.3d at 1217 (quoting *Wage Payment and Collection*: *Void Agreements:  Hearing on H.B. 298 Before the H.D. Economic Matters Committee*, 428th Sess. 1 (2011) (statement of Del. Joseline A. Pena-Melnyk)). Given that it did not have to reach this issue to resolve the case, the court did not specifically hold that the MWPCL represents strong

Maryland public policy, but it made absolutely clear its view that it does.  *Id.* at 1215 ("We encourage a future Maryland Court to hold (in light of the considered dicta expressed here) that the MWPCL represents strong Maryland public policy.").

"In the absence of a state statute or a controlling decision directly in point a federal court will attempt to determine what the highest state court would hold if confronted with the same issue."  *Sherby v. Weather Bros. Transfer Co.*, 421 F.2d 1243, 1244 (4th Cir. 1970). "Considered dicta in the opinions of the highest state court should not be ignored; and dictum which is a clear exposition of the law must be followed unless in conflict with other decisions of that court."  *Id.*  In this instance, where *Cunningham* unmistakably expressed the view of Maryland's highest court that the MWPCL represents the strong public policy of Maryland, this Court holds that because of this strong public policy, Maryland's exception to *lex loci contractus* applies in this case, such that Maryland law in the form of the MWPCL, not District of Columbia law, applies.[3]  *Cunningham*, 107 A.2d at 1211.

## B.      Commissions

LFC further argues that even if the MWPCL applies to Hausfeld's work, it is nevertheless entitled to summary judgment because no reasonable factfinder could conclude that Hausfeld has a right to any of the commissions he claims in this case.  Under the MWPCL, employers must pay employees "all wages due for work that the employee performed before the termination of employment," including commissions.  Md. Code Ann., Lab. & Empl. §§ 3-505(a), 3-501(c)(2)(ii).  Because the MWPCL does not make a distinction based on employment status at the time of payment, the law makes clear that any wage due an employee must be paid

---

[3]      Because the MWPCL applies in this case, and because Hausfeld has not alleged a cause of action under the District of Columbia Wage Act, D.C. Code § 32-1301 *et seq.*, the Court need not address LFC's argument that Hausfeld is exempt from the protections of that law.

"regardless of the ensuing termination of the employee." *Medex v. McCabe*, 811 A.2d 297, 304 (Md. 2002).   "Contractual language between the parties cannot be used to eliminate the requirement and public policy that employees have a right to be compensated for their efforts." *Id.*   Thus, the fact that the Compensation Plan states that "Upon termination of employment, no production commissions will be paid to the former originator other than at the discretion of the Executive Management Committee," Def. Ex. 6, at 6, does not provide a basis for LFC to fail to pay any commissions earned by Hausfeld during his employment.  *See Medex*, 811 A.2d at 304.

The key question relating to the claimed commissions is whether Hausfeld performed the work necessary to earn them prior to his termination.  "[A]n employee's right to payment vests when the employee does everything required to earn the wages."  *Id.* at 305; *see Hoffeld v. Shepherd Elec. Co.*, 932 A.2d at 1197, 1207 (Md. Ct. Spec. App. 2007) (holding that the MWPCL affords relief only when the employee has performed all the work necessary to earn the compensation before termination).  "Whether an employee has earned a commission depends on the terms of employment."  *Hoffeld*, 932 A.2d at 1207 (citing *Whiting-Turner Contracting Co. v. Fitzpatrick*, 783 A.2d 667, 673 (Md. 2001)).

In this instance, the Employment Agreement describes the duties of a loan originator as to "[o]riginate loans through direct borrower contact, coordinate the preparation and submission of potential loans to funding sources, facilitate the process from application to commitment, and assist in closing loans."  Def.'s Mem. Ex. 4, at 2.  But the Employment Agreement and the Compensation Plan do not explicitly define what specific work an originator must perform on a particular loan to earn a production commission. The Compensation Plan provides only that "[p]roduction commissions are available to all personnel directly engaged in the production of fee income" and that "[o]riginators will be entitled to receive production commissions, paid

quarterly in arrears after the fees are earned and received by the Company." Def.'s Mem. Ex. 6, at 4. This provision addresses the timing of payments, not what an originator must do to earn them.

There is no dispute that Hausfeld originated the loans in question, personally or as part of an arrangement with another originator. LFC argues that the evidence shows that Hausfeld did not carry out his general duty to "assist in closing the loans" and therefore did not earn the production commissions. Def.'s Mem. Ex. 4, at 2. The specific actions required to "assist in closing the loans" are not defined. Notably, however, under LFC's business model, originators are not directly responsible for all steps in the loan process. Underwriting and closing are managed by separate personnel, the underwriter and loan closing coordinators. Originators are not permitted to participate in underwriting for conflict-of-interest reasons, but they are required to "maintain the client relationship throughout the process" and "ensure client cooperation in securing documentation." Pl.'s Opp. Ex. 3, at 9-10. After the loan rate is locked, the closing process, led by the loan closing coordinator, includes ensuring that the closing documents reflect what was provided for in the commitment, ensuring that the commitment conditions are satisfied, making sure that the proper parties have signed all loan agreements, and confirming that all fees are calculated correctly and collected. No specific closing duties are assigned to the loan originator.

LFC argues that this case is similar to *McLaughlin v. Murphy*, 372 F. Supp. 2d 465 (D. Md. 2004), in which the court granted summary judgment on MWPCL claims relating to unpaid commissions sought by a mortgage broker terminated prior to the closing of certain loans. *Id.* at 474. In that case, however, the Employment Agreement specifically provided that because "getting the loan to settlement is a major part of the Employee's role," employees are not entitled

to commissions for "loans not settled and funded prior to their termination of employment."  *Id.* at 472.  On two of the loans for which summary judgment was granted, the broker had signed the customers up for loan programs for which they did not qualify, so the loans were turned over to another loan salesman who arranged to have the loans "completely redone" and received the commissions.  *Id.* at 473.  The third loan at issue did not close.  *Id.*  Because closing was not a "major part" of an LFC loan originator's role, *McLaughlin* is distinguishable from the present case.

More relevant is the similar case of *Rogers v. Savings First Mortgage, LLC*, 362 F. Supp. 2d 624, 645 (D. Md. 2005), in which the plaintiff, who was seeking to collect commissions on loans which did not close before he was terminated, was a loan officer who originated loans, then turned the loans over to other departments for processing and closing, but still was often required to perform "some additional work . . . right up until the time of closing."  *Rogers v. Savings First Mortgage, LLC*, 362 F. Supp. 2d 624, 645 (D. Md. 2005).   The court rejected the company's position that it was entitled to summary judgment based on the principle that no commissions were earned until the loan was actually closed, and instead concluded that for loans for which "no additional work was done" after the plaintiff's termination, the commission would be due. *See id.*   The court indicated that denial of summary judgment was appropriate where the defendant had not provided evidence to show that on certain loans, another loan officer took over for the plaintiff and "had to do substantial work, and was paid the commission for that work." *Id.* at 647.  Thus, where there is no formal description of what specific tasks a loan originator needs to perform to earn a commission on a loan, and the loan originator does not have primary responsibility for closing loans, the analysis of whether the loan originator earned commissions prior to his termination is necessarily fact-based and requires consideration of such factors as:

(1) whether another originator took over on the loan; (2) whether any substantial work ordinarily performed by an originator was actually performed by another prior to closing; and (3) whether the company paid the commission on the loan to another employee as a result of such work.  *See id.*; *see also Abelman v. Wells Fargo Bank*, 976 F. Supp. 2d 660, 664 (D. Md. 2013) (stating that evidence that plaintiff did not complete certain job responsibilities before leaving employment could establish that the plaintiff did not earn commissions).

Applying these principles, the Court now reviews the evidence presented on each of the commission claims.

### 1.  Deferred Commission

The parties agree that Hausfeld was not paid $202,170 in deferred commission pursuant to the Compensation Plan.  This amount, which is part of Hausfeld's overall production commission based on Annual Production, was withheld for three years after it was originally earned pursuant to a provision of the Compensation Plan.  Dellonte testified that this deferred commission rule was implemented in part to encourage retention of high-ranking employees. LFC argues that it was not required to pay those commissions to Hausfeld at the time of his termination because the three-year waiting period had not expired, and because the Employment Agreement and Compensation Plan both provide that, "Upon termination of employment, no production commissions will be paid to the former originator other than at the discretion of the Executive Management Committee."  Def.'s Mem. Ex. 6, at 4; Def.'s Mem. Ex. 4, at 4.

In *Medex*, the Maryland Court of Appeals held under the MWPCL that such commissions cannot be withheld upon termination.  811 A.2d at 40-42.  There, the plaintiff sought payment of certain incentive fees that he had earned but which had not been paid to him prior to termination because the company had a contractual provision stating that payments of incentive fees were

conditional on "being an employee at the end of the incentive plan . . . and being employed at the time of actual payment." *Id.* at 33.  The court concluded that the MWPCL required payment of these incentive fees because they had been earned prior to termination and concluded that the company could not eliminate that requirement through a contractual provision conditioning payment on continued employment.  *Id.* at 39-42.

*Medex* is controlling here.  "In accordance with the policy underlying the [MWPCL], an employee's right to compensation vests when the employee does everything required to earn the wages."  *Id.* at 41.  There is no dispute that Hausfeld's deferred commission, like the incentive fees in *Medex*, had been fully earned.  Dellonte acknowledged that the deferred commission was earned for work already performed, and that nothing further needed to be done to receive the funds other than to wait for the three-year vesting period to elapse.  Pl.'s Opp. Ex. 4, Dellonte Dep. 29:5-30:14.  Dellonte acknowledged that the only reason Hausfeld was not paid the deferred commission was that he was "terminated for cause," and the LFC policy is that no production commissions are paid to former personnel except at the discretion of management. *Id.* at 34:2–11.  But "[c]ontractual language between the parties cannot be used to eliminate the requirement and public policy that employees have a right to be compensated for their efforts." *Medex*, 811 A.2d at 39.  Thus, Hausfeld is entitled to the deferred commission under the MWPCL, notwithstanding LFC's attempt to condition payment on continued employment, and its policy that payment of commissions to terminated employees are at the discretion of management.  *See id.*; *Rogers*, 362 F. Supp. 2d at 643 (applying *Medex* to require payment of year-end bonuses conditioned on continued employment).  LFC's motion for summary judgment on this issue is therefore denied.  Rather, because there is no dispute that the deferred commission was already earned, and *Medex* establishes that Hausfeld is entitled to the deferred

commission as a matter of law, the Court grants Hausfeld's cross motion for partial summary judgment on the deferred commission.

### 2.  Forest Cove

Of the 11 loans for which Hausfeld seeks production commissions, Forest Cove is the only one which closed prior to his termination.  It was one of four loans that were the subject of a commission-split arrangement between Hausfeld and Anvar under which both originators agreed that they would receive 50 percent of the commission, regardless of how much work each performed on the loan.  This arrangement was memorialized in an email exchange on June 27, 2012, which establishes that Hausfeld, Anvar, and LFC all agreed to abide by it.  Having been informed by Anvar of the "50/50 deal split," Steve King, the LFC Vice President of Administration and Finance, requested a list of the deals subject to the agreement.  Pl.'s Opp. Ex. 10, E-Mail Chain (June 27, 2012), at 2, ECF No. 32-12.  Camps, in his capacity as Managing Director of Production, was on the email chain, responded that he was "aware of this relationship," and agreed that an updated list should be provided.  *Id.* at 1.  Hausfeld then sent a list of the deals covered by the agreement and stated, "The commission on all of these deals will be split 50/50."  *Id.*  Anvar acknowledged his agreement with the arrangement by responding, "Confirmed."  *Id.*  This evidence squarely refutes the assertion by Dellonte that LFC "was not a party to any verbal agreements" between Hausfeld and Anvar "to split production commissions 50-50."  Def.'s Mem. Ex. 1, Dellonte Decl. ¶ 21, ECF No. 31-3.

Although LFC asserts that this agreement was not binding on LFC, the documentary evidence establishes that the arrangement was made within the structure of LFC's own compensation policy.  "Whether an employee has earned a commission depends on the terms of employment."  *Hoffeld*, 932 A.2d at 1207 (citing *Whiting-Turner Contracting Co. v. Fitzpatrick*,

783 A.2d 667, 673 (Md. 2001)).   Here, the Employment Agreement and Compensation Plan both contemplate fee split arrangements.   The Compensation Plan specifically provides that "All fee splits will be recommended by the originators involved but splits will be approved by the Managing Director of Production."   Def's Mem. Ex. 6, at 6 n.4.   Camps, the Managing Director of Production, memorialized his approval of the commission-split agreement in the June 27, 2012 email chain. Although LFC arguably could have rescinded its approval of this agreement at any time, there is no evidence that it did so prior to Hausfeld's termination. Rather, it is undisputed that LFC honored this arrangement up to Hausfeld's termination.   In fact, on May 7, 2013, four days after Hausfeld's termination, King wrote to Dellonte asking if Hausfeld would be "paid anything (50/50 with Artin) on the Forest Cove Apts. deal which closed on April 26?", to which Dellonte replied, "I don't think he should be paid anything going forward."   Pl.'s Opp. Ex. 18, Email Chain (May 7-8, 2013), at 4, ECF No. 32-20.   Thus, the commission-split agreement was part of the terms of employment and was one way that Hausfeld could and did earn production commissions.

With respect to the Forest Cove loan, there is no genuine issue of material fact whether Hausfeld performed all duties required of him to earn the commission.   The loan was closed prior to his termination.   Although LFC argues that Anvar was the lead originator and did the majority of work to close the loan, it is undisputed that the commission-split agreement applied and was generally honored by LFC regardless of who served as lead originator and how the work was distributed.   Significantly, Dellonte testified that Hausfeld would have received the production commission had he not been terminated because there was no further work to be done.   Pl.'s Opp. Ex. 4, Dellonte Dep. 66:9–20 ("If he hadn't been terminated for cause, it would have been paid to him.").   Under the MWPCL, however, Hausfeld cannot be denied earned

wages simply because they were not paid prior to termination.  *Medex*, 811 A.2d at 39.  Thus, LFC is not entitled to summary judgment as to the Forest Cove loan.  Instead, because it is undisputed that Hausfeld did everything required of him to earn the production commission, and termination cannot justify a failure to pay earned commissions, the Court grants summary judgment on the Forest Cove production commission in favor of Hausfeld.

### 3.  Villa Ocotillo, Sea Mar, and Airpark Apartments

These three loans were also part of the commission-split arrangement between Hausfeld and Anvar.  As discussed above, this arrangement was memorialized among Hausfeld, Anvar, and LFC, consistent with the Compensation Plan.  Up until the date of his termination, therefore, Hausfeld was in line to receive production commissions for these loans.  In fact, on May 8, 2013, five days after the termination, King acknowledged the arrangement when he wrote, "I assume on the deals that Artin and Josh were splitting 50/50 that Artin will now get credit for 100% of the annual production?"  Pl.'s Opp. Ex 18, at 3.  Following Hausfeld's termination, Anvar was paid 100 percent of the production commissions for all three loans.

Because these loans did not close prior to Hausfeld's termination, Hausfeld would only be entitled to the production commission if he had done "everything required to earn the wages." *Medex*, 811 A.2d at 305; *Hoffeld*, 932 A.2d at 1207.  On the one hand, it is undisputed that Anvar was the lead originator on all three loans, negotiated the engagement letters, assisted with the rate lock process, and performed other duties, while Hausfeld played no little or no role in these loans, and he played no role at closing.  Hausfeld attended only one meeting with Anvar at the premises of Airpark Apartments in Maryland.

On the other hand, the evidence relating to the commission-split agreement establishes that under that arrangement, Hausfeld was deemed to have earned a production commission even

when Anvar was the lead originator and performed most or all of the work. Dellonte acknowledged that "on several deals that they split, Josh didn't do any of the work but got 50 percent of it; and on other deals Artin didn't do any of the work and got 50 percent of the deal." Pl.'s Opp. Ex. 4, Dellonte Dep. at 195:2-19. Thus, the fact that he did not carry out significant duties or assist in closing would not ordinarily have precluded him from receiving the commission. Furthermore, Anvar acknowledged that he did not attend any of the closings for these three loans, which were uneventful. Particularly where the closings of these loans required little or no participation by Anvar, a reasonable jury could conclude that as of termination, Hausfeld had done everything required of him to earn his portion of the commission. Thus, LFC's Motion for Summary Judgment is denied as to these loans.

### 4.   Remaining Loans

For the remaining loans, it is undisputed that Hausfeld was the lead loan originator, but that closing occurred after he was terminated. As described above, LFC has offered affidavits from Camps and Ford in which they assert that following Hausfeld's termination, they stepped in and performed certain tasks relating to closing that ordinarily would have been handled by the originator. These tasks largely consisted of having phone calls with clients, including to discuss certain issues that arose, such as mortgage reductions and loan extensions. Based on this evidence, LFC seeks summary judgment on the theory that because they have identified at least one task on each loan that Hausfeld should have performed as the loan originator, he has not done "everything required to earn the wages." *Medex*, 811 A.3d. at 305.

This argument is unpersuasive. Although the Employment Agreement describes the general duties of a loan originator, including "to assist in closing loans," it does not define what specific tasks, relating to closing or otherwise, must be performed in order to earn a production

commission.  Under LFC's reading, a loan originator who fell ill and had to have a colleague or senior executive take a phone call from the client or attend the closing would lose the entire production commission for the loan.  No evidence was presented that LFC's compensation policy required such an outcome, or that it was applied in that fashion.  In fact, at the time of Hausfeld's termination, King told Dellonte that "we will need to run through Josh's 2013 commission schedule and pipeline so I clearly understand what (if any) deals he is to be paid on," which suggests that earning a commission at LFC does not always require completion of every potential task relating to a loan.  Pl.'s Opp. Ex. 18 at 5.

Thus, in this instance, the appropriate analysis is whether the evidence of work performed by others on the loans establishes that no reasonable jury could conclude that a loan originator who had not been terminated, but who had failed to perform those tasks, would have received some or all of a production commission.[4]  *See Medex*, 811 A.2d at 305 ("A contract that necessitates the deprivation of some portion of fees worked for by the employee contravenes the purpose of the Act.").  In *Rogers*, the court identified the following factors to consider:  (1) whether another originator took over on the loan; (2) whether any substantial work ordinarily performed by an originator was actually performed by another prior to closing; and (3) whether the company paid the commission on the loan to another employee as a result of such work.  362 F. Supp. 2d at 645.  Here, although senior management stepped in to handle certain phone calls and other tasks on the loans in question, no other loan originators were specifically assigned to take over the loans in place of Hausfeld, and no other loan originators were paid the production commissions.  Thus, the remaining work was not sufficient to warrant the assignment of another

---

[4]   The fact that LFC management discussed whether to provide Arvan with "75%" or "100%" of the production commissions on commission-split loans led by Hausfeld, Pl. Opp. Ex. 18 at 1, indicates that LFC may grant partial commissions on occasion.

originator.  Moreover, on the one loan on which Ford engaged, Camps testified that she was the loan closer and would have participated anyway.  Pl.'s Opp. Ex. 8, Camps Dep. at 180:20-181:7.

The tasks identified by Camps and Ford largely consisted of phone calls with the borrower on a variety of issues.  The most significant appeared to be discussions regarding mortgage reductions, extension fees, and wage issues on the Orchard Park Loans, a lengthy call on the night before closing of the Arch Plaza and Ponce Plaza loans relating to a higher payoff amount, and discussions with the borrower in Adagio relating to an increase in the construction contract.  In none of the loans was there a need, as in *McLaughlin*, to have another loan originator entirely redo a loan.  *McLaughlin*, 372 F. Supp. 2d at 474 (granting summary judgment on such loans).  Although these activities may well have been tasks that a loan originator would have performed, they were not so substantial that, viewing the evidence in the light most favorable to Hausfeld, a reasonable jury could only conclude that an originator who had not been terminated but failed to carry out those tasks would have been denied the production commission.

Other factors weigh in favor of denial of summary judgment.  First, in the management email chain following Hausfeld's termination, when King suggested a discussion of what commissions were owed to Hausfeld, there was no discussion of whether Hausfeld had done enough to earn any commissions.  Rather, Dellonte made the immediate decision:  "No commissions on any deals.  He was terminated for cause."  Pl.'s Opp. Ex. 18 at 3.  He also noted, "That is probably close to $2 million in commissions he just lost."  *Id.* at 4-5.  A jury could consider such evidence in support of the view that LFC refused to pay commissions simply because he was fired and perhaps to save money, which are not permissible reasons under the MWPCL, not because he failed to do enough to earn the commissions.  *Cf. Rogers*, 362 F. Supp.

2d at 645-46 (denying summary judgment in part because of evidence of financial incentives to deny commissions to a terminated employee).

Second, it is noteworthy that virtually all of the evidence offered by LFC to establish that there were tasks relating to closing that were performed by others was submitted in the form of affidavits by Camps, Ford, and Anvar that were filed with this Motion.  As noted by Hausfeld, these affidavits were in some respects inconsistent with, and in at least one instance, contradicted by, the deposition testimony of Camps and Anvar about the same loans.  The most notable example comes from the Staunton VA loan, in which in his deposition, Camps testified that following Hausfeld's termination, the loan "was not allocated to me," that "I suspect that Karen Ford stepped in on that," and responded to the question whether he knew "what work was done specifically on Staunton VA after Josh's firing" by stating, "I do not."  Pl.'s Opp. Ex. 8, Camps Dep. 174:11-176:11.  But in his affidavit, filed later along with the Motion, he stated that he "stepped in to handle the responsibilities typically assigned to the originator" and described his role in the rate-lock process.  Def. Mem. Ex. 25, Camps Aff. ¶¶ 26-30, ECF No. 31-27.  Camps also offered significantly more detail in his affidavit relating to the Orchard Park Loans than in his deposition testimony.  Likewise, during his deposition, Anvar could not identify any work he performed on the Sea Mar and Airpark Apartments loans after Hausfeld's termination and acknowledged that he did not attend the closings, but later, in his affidavit, Anvar described in detail his work relating to closing on both loans.  When faced with a plaintiff's affidavit submitted in opposition to a motion for summary judgment that contradicts the plaintiff's earlier deposition testimony, courts may deny summary judgment if the issue of fact is created by statements in the later-filed affidavit that differ from the deposition testimony.  *Rohrbough v. Wyeth Laboratories, Inc.*, 916 F.2d 970, 976 (4th Cir. 2002); *Barwick v. Celotex Corp.*, 736 F.2d

946, 960 (4th Cir. 1984).   Rejection of such a self-serving affidavit is particularly appropriate where, as here, it provided no explanation for the inconsistencies and is not corroborated by other evidence in the record.   *See Baer v. Chase*, 392 F.3d 609, 624-26 (3d Cir. 2004).   Although this doctrine does not technically apply to this case, in which the affidavits are filed by the defendant in support of a motion for summary judgment, the same concern exists that an affidavit by a company witness, likely drafted by counsel and not subject to cross examination, is not as fair an account as the deposition testimony.   Thus, when a witness aligned with the defendant, after discovery, offers a new account of certain events that contradicts the same witness's sworn deposition testimony, the court should proceed with caution.   In this instance, the Court does not find any particular reason to question the credibility of the affiants, has considered and relied upon the affidavits, and still concludes, as discussed above, that there is a genuine issue of material fact on whether Hausfeld earned the commissions.   Nevertheless, the discrepancies between the affidavits and deposition testimony strengthen the conclusion that summary judgment is not warranted.   The Motion for Summary Judgment on the MWPCL claims is therefore denied.

### C.      Treble Damages and Attorneys' Fees

LFC seeks summary judgment on Hausfeld's demand for treble damages and attorney's fees.  LFC argues that even if it violated the MWPCL, Hausfeld is not entitled to treble damages and attorney's fees because a bona fide dispute exists on whether Hausfeld was entitled to payment.  The MWPCL provides that if "a court finds that an employer withheld the wage of an employee in violation of this subtitle and not as a result of a bona fide dispute, the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs."  Md. Code Ann., Lab. & Empl. § 3-507.2(b).  The assessment whether a bona fide

dispute exists centers on whether the party resisting the claim "has a good faith basis for doing so." *Admiral Mortg. v. Cooper*, 745 A.2d 1026, 1031 (Md. 2000). The existence of a bona fide dispute is a fact-based inquiry best left for resolution by the jury. *Balt. Harbor Charters, Ltd. v. Ayd*, 780 A.2d 303, 396 (Md. 2001). "A jury may find that a bona fide dispute existed between an employer and an employee over the amount of wages owed to the employee at the time of termination of employment while also finding that the employer owes the employee money for services rendered." *Id.* Thus, at this stage, the question to be resolved is whether there is sufficient evidence to permit a trier of fact to determine that LFC did not act in good faith when it refused to pay Hausfeld. *Id.*; *Admiral Mortg.*, 745 A.2d at 1031.

Here, the Court finds that sufficient evidence exists from which a factfinder could conclude that LFC did not act in good faith in denying Hausfeld the commissions. On the deferred commission, Dellonte acknowledged that Hausfeld had earned the commission and had done everything necessary to receive it other than wait for the obligatory three-year waiting period to elapse. Dellonte further acknowledged that Hausfeld had earned the Forest Cove production commission and would have received it if he had not been terminated. Although the Compensation Plan contains a provision stating that payment of commissions after termination occurs only at the discretion of management, under Maryland law, such provisions are not enforceable because payment of wages due is not discretionary and cannot be conditioned upon continued employment. *See* Md. Code Ann., Lab. & Empl. § 3-502(f) ("An agreement to work for less than the wage required under this subtitle is void."); *see also Medex*, 811 A.2d at 305 ("Contractual language between the parties cannot be used to eliminate the requirement and public policy that employees have a right to be compensated for their efforts.").

Although LFC arguably acted without the knowledge that the MWPCL applied to its employees, and therefore may not have known that its policy was not enforceable, the court in *Medex* denied summary judgment on the bona fide dispute issue even though the defendant argued that its withholding of wages was "based solely upon a contractual provision it believed in good faith to be enforceable." 811 A.2d at 307. Moreover, in this case, the email discussion among management following Hausfeld's termination centered not on whether he had earned the commissions, but consisted of a summary decision that no commissions would be paid because Hausfeld was terminated for cause, and included an observation that Hausfeld had just lost over $2 million. A reasonable jury could construe such evidence as indicating that the withholding of commissions was based on dissatisfaction with Hausfeld's actions and for financial reasons, rather than a good faith analysis of whether Hausfeld had earned the commissions. *See Rogers*, 362 F. Supp. 2d at 648 (denying summary judgment on the bona fide dispute issue because there was "sufficient evidence to raise questions as to Defendants' credibility in withholding wages"). Given that "the determination of discretionary damages is quintessentially a matter for the trier of fact," *Medex*, 811 A.2d at 307 (quoting *Admiral Mortg.*, 745 A.2d at 1035), the Court denies the motion for summary judgment on the issue of whether there is a bona fide dispute under the MWPCL.

## III.   Breach of Contract

LFC argues that it is entitled to summary judgment on Hausfeld's breach of contract claim because (1) the evidence establishes that Hausfeld did not earn the commissions he is seeking; and (2) under the Employment Agreement and Compensation Plan, LFC had the discretion whether to pay commissions to an employee whose employment had been terminated. As discussed above in relation to the MWPCL claims, the Court finds that there is a genuine

issue of material fact on whether Hausfeld earned the commissions, and in fact finds that he is entitled to summary judgment on the deferred commission and the Forest Cove production commission, so LFC's first argument necessarily fails.

As for the second argument, the Employment Agreement and Compensation Plan specifically allow LFC, at its discretion, to refuse to pay a terminated loan originator a production commission that the employee has otherwise earned. *See* Def.'s Mem. Ex. 6, at 4; Def.'s Mem. Ex. 4, at 4 ("Upon termination of employment, no production commissions will be paid to the former originator other than at the discretion of the Executive Management Committee."). Hausfeld argues that the Employment Agreement and Compensation Plan are unenforceable to the extent that they preclude an employee from being paid wages owed. The Court concludes that this provision is unenforceable under Maryland law, so a genuine issue of material fact exists as to whether LFC breached the Employment Agreement.

Maryland courts recognize the doctrine of *lex loci contractus*, which requires that, "when determining the construction, validity, enforceability, or interpretation of a contract, [courts] apply the law of the jurisdiction where the contract was made." *Cunningham*, 107 A.3d at 1204. Thus, District of Columbia law would ordinarily apply to the breach of contract claim. As discussed above, however, the Court finds, based on *Cunningham*, that the MWPCL, specifically its prohibition on contractual provisions that eliminate the requirement to pay earned wages, represents the strong public policy of Maryland, such that *lex loci contractus* does not apply. *See supra* part II.A.2.; *Cunningham*, 107 A.3d at 1211. Applying Maryland law, the MWPCL specifically provides that "[a]n agreement to work for less than the wage required under this subtitle is void," and defines "wage" as including bonuses and commissions. Md. Code Ann., Lab. & Empl. §§ 3-502(f), 3-501(c). The Maryland Court of Appeals has also held that

"contractual language between the parties cannot be used to eliminate the requirement and public policy that employees have a right to be compensated for their efforts." *Medex*, 811 A.2d at 304-05 (holding that a contractual provision that allowed an employer to deny payment of earned incentive payments to an employee who had left the company was unenforceable under the MWPCL). Thus, the Court finds that the contractual provision allowing discretionary denial of commissions to terminated employees is unenforceable to the extent that it would deny such employees commissions already earned.[5] Because, in the absence of this provision, a reasonable jury could conclude that LFC breached its agreement to pay Hausfeld commissions that he had earned, the Court denies LFC's Motion for Summary Judgment on the breach of contract claim.

## IV.     Declaratory Judgment

LFC moves for summary judgment on Count III, Hausfeld's claim for a declaratory judgment. A state court declaratory judgment action that is removed to federal court is treated as invoking the Declaratory Judgment Act, 28 U.S.C. § 2201 (2012). *Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co.*, 736 F.3d 255, 261 n.3 (4th Cir. 2013). A plaintiff is entitled to a declaratory judgment where "(1) the complaint alleges an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment; (2) the court

---

[5]   The Maryland public policy exception would not need to be invoked if District of Columbia law also bars enforcement of the contractual provision. There is some basis to argue that the provision would be unenforceable under D.C. law. Under the D.C. Wage Act, "[w]henever an employer discharges an employee, the employer shall pay the employee's wages earned not later than the working day following such discharge." D.C. Code § 32-1303(1) (2015). The Act also provides that "no provision of this chapter shall in any way be contravened or set aside by private agreement." § 32-1305. LFC, however, argues that the D.C. Wage Act does not apply to Hausfeld because his type of position is exempt from its provisions, such that the contractual provision would be enforceable against him. The Court need not decide this issue because either way, the contractual provision would be unenforceable. Either the D.C. Wage Act applies to Hausfeld and renders the contractual provision unenforceable, or if it does not, Maryland law applies under the public policy exception to *lex loci contractus*, and the contractual provision is unenforceable under the MWPCL.

possesses an independent basis for jurisdiction over the parties (e.g., federal question or diversity jurisdiction); and (3) the court does not abuse its discretion in its exercise of jurisdiction." *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 592 (4th Cir. 2004) (citations and internal quotation marks omitted).

LFC's argument that Hausfeld cannot show an immediate and actual controversy is premised solely on its position that Hausfeld is not entitled to unpaid wages under the MWPCL or his Employment Agreement. Because the Court has concluded that Hausfeld is entitled to summary judgment on his deferred commission and Forest Cove production commission, and that LFC is not entitled to summary judgment on the remaining production commissions, it follows that LFC is not entitled to summary judgment on this claim.

## V.      Set-off and Recoupment

Hausfeld moves for partial summary judgment on LFC's affirmative defense of set-off and recoupment. Set-off and recoupment are two similar, yet different concepts that are often confused with each other. "Recoupment is the right of the defendant to have the plaintiff's monetary claim reduced by reason of some claim the defendant has against the plaintiff arising out of the very contract giving rise to the plaintiff's claim." *First Nat'l Bank of Louisville v. Maser Auto Serv. Corp.*, 693 F.2d 308, 310 n.1 (4th Cir. 1982) (citing 6 C. Wright & A. Miller, Fed. Prac. & Proc., Civil § 1401 (1971 & Supp. 1982)); *see also Imbesi v. Carpenter Realty Corp.*, 744 A.2d 549, 552 (Md. 2000) ("'[R]ecoupment' means a diminution or a complete counterbalancing of the adversary's claim based upon circumstances arising out of the same transaction on which the adversary's claim is based."). Defendants are entitled to recoupment to the extent they are damaged by the underlying conduct. *Smith v. Smith*, 558 A.2d 798, 805 (Md. Ct. Spec. App. 1989) (citing *Hammaker v. Schleigh*, 147 A. 790, 797 (Md. 1929)). Set-off is "a

counterclaim arising from an independent claim the defendant has against the plaintiff." *First Nat'l Bank of Louisville*, 693 F.2d at 310 n.1; *Imbesi*, 744 A.2d at 552.

LFC seeks set-off or recoupment based on its allegation that Hausfeld, without authorization, directed Kimberly Estep of Branig Capital Markets to solicit bids for, or to sell, Ginnie Maes relating to the Villa Ocotillo, Arch Plaza, and Ponce Plaza loans, and that this unauthorized action resulted in losses to LFC in the amount of $280,225.[6]  Hausfeld seeks summary judgment on this affirmative defense based on his assertions that Estep never sold any loans, that LFC has offered inadmissible hearsay in support of its claim of damage to its reputation, and that LFC has not shown any quantifiable damages resulting from this episode.

These arguments fail because LFC's theory of liability does not rely on Estep having sold loans, or on any measurement of reputational damage.  Although the parties have conflicting accounts of the events involving Estep, the Court must view the evidence in the light most favorable to LFC, the nonmoving party.  *Anderson*, 477 U.S. at 255.  It is undisputed that Estep solicited bids from investors on LFC's Ginnie Maes on May 2, 2013, and that she did so at the direction of Hausfeld.  According to Dellonte, Hausfeld was not authorized to take such action.  According to William Jones, LFC's Senior Director of Loan Originations, Estep's actions caused LFC to suffer reputational harm in that key investors, particularly those which had placed bids, were angry and confused by the unauthorized solicitation of bids.  One such investor mistakenly

---

[6]  LFC appears to focus on recoupment, because it argues that its affirmative defense is based on conduct that arises out of the same transaction.  *See* Def.'s Reply at 35 ("Here, recoupment is appropriate because LFC's claim arises out of the three transactions that form the basis of this suit:  Villa Ocotillo, Arch Plaza and Ponce Plaza.").  Thus, to the extent that Hausfeld prevails on his claims relating to these loans, recoupment would be at issue.  It is not clear on this record, however, whether LFC's alleged damages could be the subject of recoupment, as opposed to set-off, against the damages sustained by Hausfeld relating to the Forest Cove loan or the deferred commissions, on which the Court has granted summary judgment, because they do not directly derive from the same loans.

believed that it had purchased a Ginnie Mae from Estep.  A bid on Villa Ocotillo could not be honored because Jones had already sold that loan, and bids on the other two loans had to be turned down.

But Jones has also identified quantifiable harm resulting from these events, because as a result of the confusion surrounding Estep's actions, he could not sell the Arch Plaza or Ponce Plaza loans for several days.  According to Jones, he had to explain the situation to investors and restore LFC's reputation before attempting to sell the loans.  When he was finally able to sell the loans on May 8, the rates were less favorable than if he had been able to sell them on May 2.  In supplemental interrogatory responses, LFC provided specific calculations showing that on the Arch Plaza loan, Estep solicited bids on May 2, 2013 with a pass-through rate of 3.00 percent, an interest rate of 3.25 percent, and a price of 107.  Given these figures, the transaction would have resulted in a $647,815 premium.  When LFC was able to trade the loan six days later, the best price it could obtain was 106, resulting in a premium to LFC of $555,270, which was $92,545 lower than on May 2.  On the Ponce Plaza loan, Estep solicited bids on May 2, 2013 with a pass-through rate of 3.00 percent, an interest rate of 3.25 percent, and a price of 107, which would have resulted in a $1,313,760 premium.  When LFC was able to sell the loan six days later, the lower price of 106 caused the premium to drop to $1,126,080, which was $187,680 less than if the loan had been sold on May 2.  Hausfeld may dispute whether LFC would necessarily have obtained the same prices on May 2 that Estep did, or whether it was operationally necessary to wait until May 8 to sell those loans, but drawing all inferences in favor of LFC, the non-moving party on this issue, the Court finds that LFC has generated a genuine issue of material fact whether it is entitled to set-off or recoupment.  Hausfeld's Motion for Partial Summary Judgment on set-off and recoupment is therefore denied.

**CONCLUSION**

For the reasons stated above, LFC's Motion for Summary Judgment is DENIED. Hausfeld's Cross-Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART.  The Cross-Motion is GRANTED as to Hausfeld's deferred commission and Forest Grove claims under the MWPCL, but is DENIED as to LFC's affirmative defense of set-off and recoupment.  A separate order follows.


Date: September 17, 2015                                     /s/
                                           THEODORE D. CHUANG
                                           United States District Judge